UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                      CASE NO. 5:19-CR-058 (TJM)

  -v-

WILLIAM WOOD,

                Defendant.

# **SENTENCING MEMORANDUM**

| DATED: | December 8, 2021 | Respectfully submitted, |
|---|---|---|
| | | LISA A. PEEBLES |
| | | Federal Public Defender |
| | By: | |
| | | Randi J. Bianco, Esq. |
| | | Supervisory AFPD |
| | | Bar Roll No. 507514 |
| | | Clinton Exchange, 3rd Floor |
| | | 4 Clinton Square |
| | | Syracuse, New York  13202 |
| | | (315) 701-0080 |

I.      **<u>Preliminary Statement</u>**

On August 23, 2021, the Defendant William D. Wood Jr., pled guilty to Counts 1 through 3 of the indictment charging him with Interference with Commerce by Robbery in violation of Title 18 U.S.C. § 1951(a) (Count 1) and Use of a Firearm in Furtherance of a Crime of Violence and Murder in violation of 18 USC § 924(j)(1) (counts 2 and 3). This offense occurred on September 15, 2018. Mr. Wood is scheduled for sentencing on December 29, 2021.

On April 15, 2019, William Wood was sentenced to life without parole in Onondaga County Court, State of New York, for two counts of Murder in the First Degree; 25 years to life for four counts of Murder in the Second Degree; a 25 years determinate sentence for Robbery in the First Degree; and a 15-year determinate sentence for Criminal Possession of a Weapon in the Second Degree. All sentences to run concurrently. The federal charges contained in this indictment stem from these charges.

A Presentence Investigation Report (hereinafter referred to as "PSR") was prepared by the United States Probation Department on November 22, 2021, in anticipation of his sentencing. According to the PSR, Mr. Wood's total offense level is 43 after acceptance of responsibility and his criminal history category is V, which results in a guideline imprisonment range of life in prison.

The Sentencing Reform Act provides, in part, that:

The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed shall consider:

> (1)     The nature and circumstances of the offense and the history and characteristics of the defendant; [and]

   (2)  The need for the sentence imposed;
     (A)  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
     (B)  To afford adequate deterrence to criminal conduct;
     (C)  To protect the public from further crimes of the defendant; and
     (D)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. (18 U.S.C. 3553(a)).

After a careful consideration of the totality of relevant circumstances surrounding this case, we are asking this Court to sentence Mr. Wood to a term of imprisonment in the bureau of prisons and all corresponding penalties *to follow the completion of his life sentence in state court*. The parties have agreed that Mr. Wood will serve his state sentence prior to the commencement *of any federal sentence* imposed [PSR ¶ 6]

## II.  Mr. Wood's Personal History and Characteristics

*a) Upbringing*

William suffered from abuse, neglect and abandonment growing up.[1] His life was a continuous struggle, and he had no chance of a successful life from the beginning. William is the only child born to his mother J.C., then 17, and his father W.W., then 22. Before William, the couple had a prior child who was stillborn at birth. J.C. also had two prior miscarriages. William's parents were uneducated as his mother dropped out of school in the eighth grade and his father only obtained a GED. The couple never married, and neither was able to hold a steady job. During J.C.'s pregnancy with William she was the victim of domestic violence. William was born by an emergency C-section and was a breach birth. He reportedly turned blue at birth and was placed in ICU.

---

[1] William's background is documented in the confidential report prepared by the government's expert, and we will rely on the facts contained therein.

3

William's living situation was chaotic with constant moves and a parade of different persons in and out of his life. His suffered from lead poisoning when he was exposed to it in the various residences he lived in with his family. Lead pipes supplied water to at least eight, and likely all sixteen, of the homes that he lived in before he was thirteen years old. Furthermore, William's first two homes—the homes where he lived during his most critical developmental years—had lead pipe water lines. None of the homes that we could identify were built after 1978, meaning that in all likelihood these homes all contained lead paint.

There is also physical evidence that William was exposed to a debilitating amount of lead as a child. Lead is a neurotoxin that remains a "global hazard" for human health. Childhood exposure to lead is both devastating and irreversible. There is no recognized "safe" blood lead levels (BLL) for the human body,[2] which is measured in micrograms per deciliter (mcg/dl), but a BLL greater than 5 mcg/dl is deemed "action level." Today, young children in New York State have an average BLL of around 1.4 mcg/dl.

By today's standards of lead poisoning, then, testing between the ages of one and three years old demonstrates that William was an extreme outlier for childhood blood BLL. According to Table 1 below, William's average BLL over this two-year period was 25 mcg/dl, demonstrating his sustained poisoning. William's highest recorded BLL was 35 mcg/dl—registered twice—when he was seventeen and eighteen months old.

---

[2] *See Childhood Lead Poisoning Prevention Program*, CENTERS FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/nceh/lead/default.htm (last accessed Oct. 4, 2019); *Recommended Actions Based on Blood Lead Level*, CENTERS FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/nceh/lead/acclpp/actions_blls.html (last accessed Oct. 4, 2019).
*What Your Child's Blood Lead Test Means*, N.Y. ST. DEP'T OF HEALTH, ht f (last accessed Oct. 4, 2019).

| Table 1: William Wood's Historical Lead Testing Levels |||
|---|---|---|
| Date | Age (year - month) | Blood Lead Level (mcg/dl) |
| December 30, 1986 | 1-0 | 21 |
| January 27, 1987 | 1-1 | 15 |
| June 1, 1987 | 1-5 | 35 |
| July 3, 1987 | 1-6 | 35 |
| July 20, 1987 | 1-7 | 32 |
| September 29, 1987 | 1-9 | 26 |
| December 7, 1987 | 1-11 | 20 |
| June 28, 1988 | 2-6 | 15 |
| February 7, 1989 | 3-1 | 16 |
| --- | Average: 1-9 | Average: 25 |

Aside from his elevated BLL, William has maintained a short stature his entire life, remaining below the 15th percentile in height from ages three to fifteen, despite the fact that his parents and siblings are all of average to above average heights. Furthermore, his weight never exceeded the 30th percentile during those years. While William's stature might not be noteworthy by itself, it becomes noteworthy when combined with William's high BLL as a child. The World Health Organization has noted that short stature and weight loss are "chronic" symptoms of lead poisoning. WORLD HEALTH ORGANIZATION, CHILDHOOD LEAD POISONING 51 (2010). Moreover, clinical studies have demonstrated an inverse effect between BLL and height. See Masayuki Kaji & Yoshikazu Nishi, *Lead and Growth*, 15 CLINICAL PEDIATRIC ENDOCRINOLOGY 123, 126 (2006) (summarizing studies that have shown a higher BLL as a child is associated with reduced height).

William was enrolled in four different schools by the time he was 11 years old due to his family's constant moves. He was labeled emotionally disturbed, and learning disabled with a full-scale IQ at 73 and placed in a special education classroom of students who were mentally

retarded. He was at a reading level of second grade and a math level of third grade. He dropped out of school in the eighth grade. He ultimately received social security due to his disability.

Reports written during that time state that by the time William was 12 years old he was constantly running away from home due to problems at home and child protective services had to intervene. At 13, William was referred to the McCarthy School because of his behavior. This behavior included leaving the school buildings, jumping from unsafe heights, as well as bizarre behavior such as making strange noises and licking inappropriate surfaces. There are also reports of William walking out in traffic.  The retired principal of the McCarthy School in 1999-2001, remembers William. She states that, of the hundreds of children over the course of her career as an educator, she remembers him as "the most picked on student" she ever encountered.  William was not only picked on by peers, but also by the adults, and that the adults let the other children get away with bullying William, doing nothing to stop it or to protect him.  She recalls that William reported being physically attacked in the classroom and on the bus.  One incident the principal remembered  was when William was choked and punched by a teacher.  Reportedly, the teacher admitted to the physical altercation but claimed that it was "an accident."

During this time period reports document a very unstable family situation regarding parenting and that William ran away from home for days at a time and was sleeping in cars and garages. At one point William was so desperate to leave home he ran away and stayed with a strange man for eight days before he was found, and the man was arrested and jailed.

At 13 years old, the 4'10' -  89 lb., William was placed as a juvenile delinquent by the Onondaga County Department of Social Service.  Because of the number of times, he had run away from home, he was placed in Hillbrook Detention Facility.  In February 1998, he was then transferred to a group home called George Junior Republic (the "Republic") where he remained

for one year. During his time at the Republic, he was placed on medications to address the symptoms of ADHD. After William was discharged from the Republic, the instability and chaos continued.

### b) Adult Life

William's adult life was as chaotic as his childhood. This is due to his intellectual disability, mental health issues and problems with drugs.  William was never able to keep a steady job. He worked at numerous positions such as a cook, a laborer and washing dishes. He was either fired or quit these jobs and moved on to the next entry level job. He always had problems managing his finances and as a result was often homeless and never able to keep a steady residence. He moved in with various friends and family but never stayed for long. On the two occasions he was able to obtain an apartment on his own, he was evicted for failure to pay the rent.

William always had difficulty having friendships and relationships. He grew up without having any friends and was constantly bullied. The one friend he did have was murdered in his presence.  He was married when he was 19 years old and has one child. That relationship was tumultuous and ended after William's ex-wife had him arrested. William has had no contact with his child. The one person William is closest to is his sister I.C. who remains supportive of him and the two remain in contact.

### III.     Intellectual deficit

Every facet of William's life has been affected by his intellectual deficit.  This includes his behavior while incarcerated.  An extensive forensic psychological interview was conducted on November 6, 2020, by the government's forensic psychologist to determine whether William met the criteria for a diagnosis of an intellectual disability.  In that regard the government's

expert reviewed, among other items, William's pediatric medical records, numerous school records, psychological reports, residential treatment program records, child protective service records, IQ testing, criminal history reports, correctional facility records, statements related to the present offense and records related to his family. The government's expert concluded that "within a reasonable degree and clinical certainty that Mr. Wood's WAIS-IV test results from 11/6/20, and from prior testing both recently and from early development, when adjusted for the Flynn effect and SEM, is lower than two standard deviations than the population mean on the WAIS-IV."  His Full-Scale IQ was determined to be 65.09-73.57.  The government's expert also concluded that the adaptive deficit or liability prong of the Intellectual Disability diagnosis is met. "It is the opinion of this examiner, within a reasonable degree of certainty, that Mr. Wood meets the clinical threshold for the AAIDD criteria and DSM-V diagnosis of Intellectual Disability (ID)."  The government's notice of intent to seek the death penalty was withdrawn because William Wood was determined to have an intellectual disability rendering him constitutionally and statutorily exempt from the death penalty.

### IV.    CONCLUSION

In conformity with the Sentencing Guidelines, an imposed sentence should not be greater than what is necessary to accomplish the goals outlined in 18 U.S.C. §3553.  We are asking this Court to sentence Mr. Wood to a term of imprisonment in the bureau of prisons and all corresponding penalties *to follow the completion of his life sentence in state court*.  The parties have agreed that Mr. Wood will serve his state sentence prior to the commencement *of*

*any* federal sentence imposed [PSR ¶ 6].

DATED:  December 8, 2021

                                              Lisa A. Peebles
                                              Federal Public Defender

                               By:    <u>S/Randi J. Bianco, Esq.</u>
                                              Supervisory Ass't Federal Public Defender
                                              Bar Roll No. 507514
                                              Clinton Exchange, 3rd Floor
                                              4 Clinton Street
                                              Syracuse, New York   13202
                                              (315) 701-0080

To:    Lisa Fletcher, AUSA
        Courtney A. Tafel,  USPO
        William Wood